ALASKA BANKING & SAFE DEPOSIT CO. OF NOME, ALASKA, v. MARITIME INS. CO., 'Limited. SAME v. OCEAN MARINE INS. CO., Limited. WOODIN v. ALLIANZ INS. CO., Limited. SAME v. CHINA TRADERS' INS. CO., Limited. SAME v. MARITIME INS. CO., Limited. SAME v. YANG TSZE INS. ASS'N, Limited. ELLIOTT v. ALLIANZ INS. CO., Limited. SAME v. CHINA TRADERS' INS. CO., Limited.

(District Court, W. D. Washington, N. D. September 11, 1907.)

Nos. 3180–3185, 3195, 3196.

INSURANCE—MARINE INSURANCE—DEFENSES AGAINST LIABILITY — DEVIATION FROM VOYAGE.

Respondents severally insured parts of the cargo of a sailing vessel against sea perils on a voyage from Seattle to Alaskan ports. After reaching the port which was the termination of the voyage, and discharging a part of the cargo for that port, the vessel again went to sea for the purpose of discharging cargo at another port which she had passed without stopping owing to unfavorable weather, and before reaching it was wrecked. *Held,* that the voyage covered by the insurance terminated when the vessel reached her port of final destination, and that respondents were not liable for cargo lost after she had voluntarily left such port.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, §§ 329, 379–381.]

In Admiralty. Libels in personam, to collect marine insurance. Decree for respondents.

H. R. Clise, Shepard & Bailey, and Howard Waterman, for libelants.

Kerr & McCord and W. H. Gorham, for respondents.

HANFORD, District Judge. According to the pleadings, each of these suits is based upon a certificate of insurance covering a distinct part of the cargo carried by the bark Coryphene on her last voyage. The loading ports were Comox, B. C., and Seattle, and the ports or places at which the cargo was to have been discharged were Solomon City, Tin City, and the towns on Port Clarence Bay, in Alaska. The vessel sailed from Seattle in June, 1905, under the following sailing order given by the owner to her master:

"Proceed to Solomon, put the Solomon cargo out there, and proceed to Tin City and take the Tin City cargo out; go to Teller and lay there for thirty days."

The last point on the route at which freight was to be discharged is Teller, on Port Clarence Bay.. The vessel went to Solomon, and discharged freight there. Off Cape Nome, and while pursuing her voy-

age under full sail, the steamer Corwin came alongside of her, and took part of her cargo of coal. She arrived off Tin City; but, on account of a strong shoreward wind and fog, she was unable to land the freight destined for that place, and she continued onward to Port Clarence, and anchored in the bay, about four miles distant from Teller. While at anchor there, she discharged freight, some of which was lightered ashore and some transferred to the steamer Corwin. After being at anchor three days, and without discharging all of the cargo which was for destination points on that bay, the Coryphene went out to sea again, for the only purpose of delivering freight at Tin City, and she was to have returned, but she was wrecked, and the remainder of the insured cargo became a total loss. It is admitted that the insurance was written; that the premiums were paid; that the property insured was lost as a consequence of a marine disaster; that proofs of the losses were made in due form and timely; and that payment has been refused.

The main ground of defense relied upon in all the cases is alleged deviations from the voyage contemplated and specified. To simplify the controversy, it will be assumed by the court that it was known and agreed to by a general agent representing all of the defendants, before the certificates of insurance were issued, that the Coryphene was, for this voyage, a general freight ship, and that she would make stoppages to deliver freight at intermediate points between Seattle and Port Clarence, and that each and all the respondents are estopped from claiming deviations avoiding the insurance previous to the arrival of the ship at Port Clarence Bay, which is deemed to be the port of final discharge. It must be understood that this assumption is made for convenience only; and with respect to matters assumed this decision is not to be a precedent for future cases.

In the argument it is contended that, on account of the bad weather, the ship passed Tin City, and went into the entrance of Port Clarence Bay for safety; that it was a mere coincidence that this bay happened to be the nearest port of safety, and also the terminus of the voyage; and that it was not a deviation under the circumstances for the ship to run for protection, as she did, and wait for a change of weather. But the facts proved by the evidence are somewhat different. The ship sailed well up into the bay, and anchored near enough to Teller to discharge the freight which she had to deliver there by lightering it. Her owner was landed there, and she opened her hatches, and discharged part of her cargo before attempting to run back to Tin City. The following entries in ship's log under the head of "Remarks" show the arrival of the ship at her destination and the conditions:

### "Remarks.

"28th day of July, 1905: Light breeze. Foggy. 4 a. m. Sledge Isl. bore S. W. W. Dist. 3 miles. Hove the lead half hour. 8 a. m. Weather same. Current setting 3½ knots W. Noon. Light breeze. Foggy. Hove the lead every half hour. 7:30 p. m. 24 fathoms wore ship. 12 m. n. 17 fathoms water.

"29th day of July, 1905. 1 a. m. Fog lifted. Sighted Cape York, about 2 miles on the lee beam. Current setting to Westward. 5:30 a. m. Passed in Pt. Spencer. Mod. breeze, foggy. 8:30 a. m. Let go starboard anchor off

Teller. Made fast all sails. Noon. Crew employed making ready for dis-charging cargo.

"30th. No work, this day being Sunday.

"31st. Light S. W. wind. Fine weather, employed getting water from Reindeer Station.

"Aug. 1st. Discharged 25 tons of coal and delivered it at Reindeer Station. 5 p. m. S. S. Corwin came alongside (commenced giving her coal at 10 p. m. till 12:30 a. m. Donkey broke down, and started again at 3:40 a. m. till 4:20 a. m.

"2nd day of Aug. 11:30 a. m. left Teller for Tin City. Light var. winds. 4 p. m. Passed by Pt. Spencer. 12 m. n. Calm. 2:20 a. m. Anchored near Pt. Spencer. 5 a. m. Light southerly wind. Hove up anchor, steered along the land. Crew empl. sacking coal."

In the testimony and stipulations references are made to a protest, but the document is not listed as an exhibit. I presume that it was not introduced, and I regard the ship's log as the strongest evidence touching this point, and it proves to my satisfaction that the ship did arrive at the terminus of her voyage. The evidence also proves that her departure was not from necessity, either real or apparent, but was for convenience only, to discharge the Tin City freight while retaining part of the cargo for ballast. The Tin City freight was shipped under a contract with the shippers that, if it should be impracticable to land it there, it might be reshipped and forwarded by another vessel, and it was not impracticable to have disposed of it in that manner. The only expected deviations which the insurers could have had in contemplation were stoppages to discharge freight at intermediate places between the last loading port and the terminus on Port Clarence Bay, and, when the vessel was anchored safely in that harbor, the perils of navigation insured against ceased. Therefore I find that venturing out to sea again for the purpose of returning to Tin City, with part of the insured cargo on board, was an unexpected deviation not contemplated when the insurance was written, nor assented to afterwards by the insurers.

In the arguments the respondents are upbraided for making purely technical defenses, as if standing upon the terms of their contracts were skulking, crafty, or culpable conduct, but the court cannot thus contemptuously brush aside legal rights. A technical defense rests upon recognized principles of law which all courts are bound to respect. And I will say, further, that the main defense which the court sustains is meritorious in equity, because the property was insured for only one voyage, and the loss was a consequence of a second exposure to sea perils, the risk of which the respondents did not verbally or otherwise promise to carry. The third section of the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [3 U. S. Comp. St. 1901, p. 2946]) exempts ships, their owners and charterers from liability for losses under certain conditions, by no possible construction can it be a creator of a liability, and the attempt to find support in that statute for the libelant's position is a complete failure.

The court directs that a decree be entered in each case that the libelant take nothing, and that the suit be dismissed, with costs.